Upon review of the competent evidence of record, and finding no good grounds to receive further evidence or rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, affirms the Opinion and Award of the Deputy Commissioner, with minor modification.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission, and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of the parties.
3. On the date of the injury giving rise to this claim, an employment relationship existed between plaintiff and defendant-employer.
4. On the date of the injury giving rise to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers Compensation Act.
5. Plaintiffs average weekly wage on the date of the injury giving rise to this claim was $233.45. This yields a compensation rate of $155.64.
6. Plaintiff received short-term disability benefits from 4 July 1998 through 15 August 1998 in the total amount of $2,223.76.
7. In addition to Dr. DiFiores deposition transcript, the parties stipulated into evidence in this matter stipulated exhibit one, a packet of plaintiffs medical records. In addition, defendants introduced and the Deputy Commissioner admitted into evidence defendants exhibit one, a statement of Beverly Sowers, and defendants exhibit two, a statement of Deanna Forsyth.
8. The issues to be determined are whether plaintiff sustained a compensable injury by accident on 19 June 1997, and if so, to what medical and indemnity benefits is plaintiff entitled.
***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
 FINDINGS OF FACT
1. On the date of the hearing before the Deputy Commissioner, plaintiff, who is right-hand dominant, was thirty-nine years old. English is plaintiffs second language. Prior to working for defendant-employer, plaintiff worked as a cashier at Wal-Mart for four years.
2. Plaintiff began working for defendant-employer in 1994 when she was hired to unload trucks and stock items. In 1995 plaintiff became a cashier, which entailed working a cash register and doing refunds, as well as some cleaning.
3. On 19 June 1997, plaintiff was working two registers at the service counter when she twisted her ankle on a plastic hanger that was lying on the floor. This caused plaintiff to trip, and she threw her hands out in front of her to catch herself. The palm, or underside of plaintiffs right wrist struck the edge of the service desk door, causing immediate pain in plaintiffs right wrist. One of plaintiffs coworkers heard a customer yell, and when she looked around to see what had happened, this coworker saw plaintiff with her hand on the service desk door. Another of plaintiffs coworkers actually witnessed plaintiff trip and grab or hit the service desk door. Neither of these witnesses claims to have seen plaintiff fall, and plaintiff has never made an allegation that she fell, i.e., that she fell to the floor, when she tripped.
4. There is some evidence in the record to the effect that plaintiff complained of pain in her wrist prior to this incident, and that plaintiff had assisted her husband in removing the bumper of their car. The evidence to the effect that plaintiff injured her wrist assisting her husband remove a car bumper is deemed not credible.
5. Plaintiff immediately reported the incident to her supervisor, Roy Oglesbee. Plaintiff also reported the incident to Deanna Forsyth, who was then defendant-employers assistant manager. Plaintiff asked Ms. Forsyth for some pain medication, which Ms. Forsyth declined to give, saying she was not authorized to do so. Instead, plaintiff called her husband, who came to the store and brought plaintiff an over-the-counter medication. Plaintiff worked the remainder of her shift on 19 June 1997.
6. On 20 June 1997 plaintiff presented at the Camp Lejeune Naval Hospital, where she reported that the previous day she had fallen and struck her right hand on a door. Plaintiff complained of pain and swelling in her right hand. Plaintiff returned to the Naval Hospital on 26 June 1997 and 1 July 1997, at which time she was referred to an orthopedic for evaluation, as there was speculation that she may be developing reflex sympathetic disorder ("RSD). Also on 1 July 1997 plaintiff was seen at Doctors Urgent Care Centre, where she reported twisting her ankle on a hanger and falling on her wrist. Plaintiff complained of pain from her shoulder to the fingers of her right hand and numbness in her fingers.
7. On 8 July 1997 plaintiff was seen at Coastal Orthopaedics and reported that about three weeks prior she had fallen on her outstretched right wrist while at work. Dr. OMalley felt that plaintiff was developing early RSD, and he referred her to physical therapy. Plaintiff began a course of physical therapy with The Physical Therapy Clinic, and on 22 July 1997 Dr. OMalley indicated that plaintiff seemed to be improving, so he released her for light duty work. However, plaintiff continued to experience pain with some burning and swelling. By 26 August 1997, Dr. OMalley noted that plaintiff had "unusual complaints and again diagnosed RSD. On 1 October 1997 Dr. OMalley recommended a referral to a neurologist for EMG testing due to plaintiffs continued complaints.
8. Defendants paid for at least some of plaintiffs visits with Dr. OMalley at Coastal Orthopedics, but declined to pay for plaintiffs neurological consultation and testing. Plaintiff was seen by Dr. Maldonado and underwent EMG testing at Coastal Neurological Associates, all of which showed essentially normal results, with the exception of a small bone cyst in the head of the navicular bone in the wrist. There was also a slightly unusual finding in plaintiffs cervical spine, which the radiologist indicated might be evidence of a nondisplaced fracture.
9. Plaintiff next underwent an MRI at Onslow Memorial Hospital on 12 November 1997 and a CT scan of the cervical spine on 18 November 1997. Both were essentially normal.
10. Plaintiff began treating with Dr. DiFiore at Onslow Orthopaedics on 19 November 1997. Plaintiff had treated with Dr. DiFiore beginning in 1993 for right carpal tunnel syndrome. When he began treating plaintiff again in November 1997, Dr. DiFiore did not suspect recurrent carpal tunnel syndrome, but initially thought that plaintiff had cervical strain and right wrist sprain. By 12 December 1997 Dr. DiFiore began to suspect possible rotator cuff impingement. Dr. DiFiore continued to treat plaintiff, and plaintiff continued to have unusual symptoms such as pain in her neck when she bent forward and light-headedness.
11. An MRI subsequently performed on plaintiff revealed a partial rotator cuff tear with chronic tendonitis and impingement in her right shoulder, and on 10 March 1998 Dr. DiFiore restricted plaintiff to no lifting with the right arm ninety degrees to horizontal from the body, and no repetitive lifting or lifting over ten pounds occasionally. Dr. DiFiore treated plaintiff conservatively with cortisone shots, pain and anti-inflammatory medications, and exercises. However, because these conservative measures ultimately proved unsuccessful, on 3 June 1998 Dr. DiFiore performed a Neer acromioplasty in which he removed the tip of plaintiffs shoulder blade and he excised the distal end of the clavicle.
12. Plaintiff underwent physical therapy following her surgery, where she had some improvement, but she began to complain more of problems with the right side of her neck. On 17 December 1998 Dr. DiFiore noticed that he could detect some "fullness in her right supraclavicular region. Dr. DiFiore at this point diagnosed possible thoracic outlet syndrome. By January 1999 Dr. DiFiore indicated that plaintiffs complaints suggested either thoracic outlet syndrome, RSD, or both, and he recommended a multidisciplinary pain clinic approach if plaintiff was found to have no underlying vascular problems. No vascular dysfunction was found subsequently, and in March 1999 Dr. DiFiore again recommended treatment at a pain clinic.
13. Plaintiff last worked for defendant-employer on 12 March 1998. Plaintiff was unable to work in any capacity from 13 March 1998 through 28 October 1998, at which time it appears that she may have been able to work in some capacity, but not at full duty. Although Dr. DiFiore had not seen plaintiff since March 1999, as of the date of his deposition on 24 May 1999, Dr. DiFiore indicated that plaintiff could probably return to work with restrictions in May 1999, but he had referred her for another neurological examination.
14. Prior to the injury giving rise to this claim, in 1993 plaintiff developed right carpal tunnel syndrome and de Quervains syndrome, and she had surgical releases on 6 January 1994. Plaintiff obtained relief from the surgery. Plaintiffs right wrist, shoulder, and neck problems following the 19 June 1997 injury are not related to her previous carpal tunnel syndrome and de Quervains syndrome.
15. The Deputy Commissioner found that plaintiffs testimony as to the events of 19 June 1997 was credible, as her story was corroborated not only by her coworkers, but also by the medical records. The Full Commission declines to reverse this credibility determination. In addition, the greater weight of the medical evidence, in particular the immediacy of plaintiffs complaints of pain into her arm and shoulder, corroborates plaintiffs claim that striking her right wrist led to the problems for which she subsequently became disabled.
16. On 19 June 1997 plaintiff sustained a compensable injury by accident arising out of and in the course of her employment when she tripped and hit the underside of her right wrist on the service counter door. According to the greater weight of the medical evidence, an injury of the type sustained by plaintiff is consistent with the development of a rotator cuff injury and a straightening of the muscles in the neck and with the symptoms she experienced thereafter.
17. As a result of her compensable injury by accident on 19 June 1997, plaintiff was rendered unable to work in any capacity for several days. (Neither party has cited the portion of the record that specifies which days were missed.) Plaintiff then returned to work but was unable to work after 13 March 1998. At the time of the hearing before the Deputy Commissioner, and as of the date of Dr. DiFiores deposition, plaintiff had not been released to return to work and continued to be disabled.
18. As of the date of Dr. DiFiores deposition, plaintiff had not been assigned a permanent partial impairment rating.
***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident to her right wrist, shoulder, and neck on 19 June 1997. G.S. 97-2(6).
2. The accident on 19 June 1997 contributed in some reasonable degree to the development by plaintiff of a rotator cuff tear and impingement and thus to her resulting disability. Click v. PilotFreight Carriers, Inc., 300 N.C. 164, 265 S.E.2d 389 (1980).
3. As a result of her compensable injury by accident on 19 June 1997, plaintiff was totally disabled for several days immediately following the injury by accident and from 13 March 1998 and continuing until further order of the Commission. Plaintiff is entitled to weekly compensation benefits in the amount of $155.64 during her period of total disability. G.S. 97-29.
4. If, subsequent to the date of Dr. DiFiores deposition, plaintiff is found to be capable of working within some restrictions, and if defendants offer a position suitable for her physical capacity, plaintiff has an obligation to attempt this work on a trial return to work basis. G.S. 97-32 and 32. 1; Rule 404A.
5. As a result of her compensable injury by accident on 19 June 1997, plaintiff is entitled to have defendants provide her with all medical treatment that was or is reasonably necessary to affect a cure, give relief, or lessen the period of her disability. G.S. 97-2(19) and 25.
6. Plaintiff is not entitled to attorneys fees pursuant to G.S.97-88.1, as defendants defense of the claim was reasonable.
7. Defendants are entitled to a credit for any short-term disability benefits received by plaintiff which were employer-funded. G.S. 97-42.
***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Defendants shall pay to plaintiff total disability benefits in the amount of $155.64 per week for the short period of time plaintiff was out of work immediately following her injury by accident, and then beginning 13 March 1998 and continuing until plaintiff returns to work or until further Commission order. Any accrued amount shall be paid in a lump sum, subject to attorneys fees and to a credit for employer-funded disability benefits paid to plaintiff.
2. Defendants shall provide plaintiff with all reasonable and necessary medical treatment incurred or to be incurred by plaintiff as a result of her compensable injury by accident.
3. Counsel for plaintiff is entitled to a reasonable attorneys fee in the amount of twenty-five percent of the compensation owed plaintiff in this Award. Of the accrued amount to be paid to plaintiff under paragraph one of this Award, defendants shall pay twenty-five percent directly to plaintiffs counsel of record. Of the ongoing benefits, defendants shall forward every fourth compensation check directly to plaintiffs counsel.
4. Defendants shall pay the costs.
S/_______________ RENEE C. RIGGSBEE COMMISSIONER
CONCURRING:
S/_______________ LAURA K. MAVRETIC COMMISSIONER
S/_______________ CHRISTOPHER SCOTT COMMISSIONER
RCR:db